UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                            :

KELLY TOYS HOLDINGS, LLC,              :

                            :

                 Plaintiff,       :

                            :            21-cv-8435 (LJL)

     -v-                        :

                            :        <u>OPINION AND ORDER</u>

AIRPODS PRO STORE a/k/a MYGHD, et al.,  :

                            :

               Defendants.    :

                            :
---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

     Plaintiff Kelly Toys Holdings, LLC ("Plaintiff") brings this action against eighty individuals and/or businesses who, using accounts with an online marketplace platform ("User Accounts"), operate one or more commercial businesses to manufacture, import, export, advertise, market, distribute, offer for sale and/or otherwise deal in products ("Merchant Storefronts") to United States consumers, including those located in the state of New York (collectively, "Defendants") alleging trademark counterfeiting, trademark infringement, false designation of origin, passing off, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1116(d), 1117(b)–(c), 1125; copyright infringement under the Copyright Act, 17 U.S.C. § 501(a); and unfair competition under New York common law. *See generally* Dkt. No. 8 ("Complaint" or "Compl."). Defendants have not appeared in the action. Plaintiff now moves for default judgment and a permanent injunction against Defendants pursuant to Federal Rule of Civil Procedure 55(b)(2). Dkt. No. 26.

     For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

     By defaulting, Defendants have admitted the well-pleaded factual allegations of the

Complaint.  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011).  The Complaint alleges as follows.

Plaintiff is a leading manufacturer and distributor of high-quality plush toys and gifts and is known for its best-selling brands such as Pillow Chums, Kellybaby, and Kellypet.  Compl. ¶ 7. Among Plaintiff's most popular toy products are Squishmallows ("Squishmallows Products"), "a line of loveable buddies made with a super soft, marshmallow-like texture that come in a variety of sizes from 3.5-inch clip-ons to extra-large 24 inch plush toys."  *Id.* ¶ 9.  The Squishmallows Products typically retail for between $7.99 to $44.99.  *Id.* ¶ 13.

Plaintiff is a limited liability company with its principal place of business in California. *Id.* ¶ 5.  Plaintiff sells its Squishmallows Products through major U.S. retailers and e-commerce sites such as Amazon, Target, and Walmart.  *Id.* ¶ 12.  Since their debut in 2017, over 73 million Squishmallows Products have been sold worldwide.  *Id.* ¶ 10.  In 2020, the Squishmallows Products received a "Best Toy of the Year" award from Learning Express.  *Id.* ¶ 11.

Plaintiff owns U.S. Trademark Registrations for "SQUISHMALLOW," "ORIGINAL SQUISHMALLOWS," and "FLIP A MALLOWS" for goods in Class 28 (collectively, the "Squishmallows Marks").  *Id.* ¶ 15.  It also owns registered copyrights in and related to the Squishmallows Products ("Squishmallows Works").  *Id.* ¶ 17.  The success of the Squishmallows Products is due in part to the marketing and promotional efforts of Plaintiff and its predecessor. *Id.* ¶ 19.  Those efforts include advertising and promotion, both domestically and abroad, through social media and Plaintiff's website, https://www.squishmallows.com.  *Id.*  Plaintiff's success is also due to its use of high-quality materials and processes in making the Squishmallows Products.  *Id.* ¶ 20.  Additionally, Plaintiff owes a substantial amount of the success of the Squishmallows Products to its consumers and the word-of-mouth buzz that its consumers have

generated.  *Id.* ¶ 21.

Defendants use accounts with an online marketplace platform, DHgate.com ("DHgate").
*See id.* ¶ 28.  DHgate allows manufacturers and other third-party merchants, such as Defendants,
to advertise, distribute, offer for sale, sell, and ship retail products originating from China
directly to consumers worldwide and specifically to consumers residing in the U.S., including
New York.  *Id.* ¶ 24.  DHgate has generated billions in sales worldwide.  *Id.* ¶ 25.  International
buyers, including those in the U.S., make up a significant percentage of the business done on
DHgate.  *Id.*  For example, DHgate offers 25 million consumer products from 1.2 million
suppliers for sale on its platform and attributes over half of its sales to U.S. buyers alone.  *Id.*

The Complaint broadly accuses each Defendant of violations in connection with selling
or offering for sale "Counterfeit Products": trademark counterfeiting, trademark infringement,
false designation of origin, passing off, and unfair competition under the Lanham Act, 15 U.S.C.
§§ 1114, 1116(d), 1117(b)–(c), 1125; copyright infringement under the Copyright Act, 17 U.S.C.
§ 501(a); and unfair competition under New York common law.

Counterfeit Products are defined broadly to be products bearing or used in connection
with the Squishmallows Marks and/or Squishmallows Works, and/or products in packaging
and/or containing labels and/or hang tags bearing the Squishmallows Marks and/or
Squishmallows Works, and/or bearing or used in connection with marks and/or artwork that are
confusingly or substantially similar to the Squishmallows Mark and/or Squishmallows Works
and/or products that are identical or confusingly or substantially similar to Squishmallows
Products.  Compl. at ii.  Defendants' Counterfeit Products are nearly indistinguishable from
Plaintiff's Squishmallows Products, only with minor variations that no ordinary consumer would
recognize.  *Id.* ¶ 36.

Plaintiff alleges that through their Merchant Storefronts on DHgate, Defendants offer for sale and/or sell Counterfeit Products and target and ship such products to customers located in the United States, including New York. *See id.* ¶ 24. Plaintiff further alleges that Defendants accept payments for Counterfeit Products in United States dollars through various payment processing services. *Id.* ¶ 38. Defendants have never been authorized to sell or copy Squishmallows Products or to use the Squishmallows Works or Squishmallows Marks. *Id.* ¶ 35.

The Complaint provides helpful illustrations of three particular Counterfeit Products offered for sale by three Defendants. *Id.* ¶¶ 39–41. The Complaint also attaches as Exhibit D listings for Counterfeit Products for each of the Defendants, demonstrating that they offer for sale Counterfeit Products. *Id.* ¶ 34, Ex. D. Plaintiff specifically retained Epstein Drangel to investigate and research manufacturers, wholesalers, retailers and/or other merchants offering for sale and/or selling Counterfeit Products on DHgate. *Id.* ¶ 33. Epstein Drangel identified Defendants in this action and verified that each Defendant offered for sale and provides shipping to a New York address. *Id.* ¶ 37.

## PROCEDURAL HISTORY

Plaintiff initiated this action by complaint on October 13, 2021. Dkt. No. 27 ¶ 9 ("Futterman Aff."). Subsequently, the Court entered the temporary restraining order ("TRO") on October 21, 2021. *Id.* ¶ 11. Pursuant to the TRO, Plaintiff served Defendants on November 10, 2021 with the Summons, Complaint, TRO and all papers filed in support of Plaintiff's application. *Id.* ¶ 14. On March 7, 2022, the Court held a Preliminary Injunction Show Cause Hearing, at which no Defendants appeared. *Id.* ¶ 16. On March 15, 2022, the Court entered the Preliminary Injunction Order against all Defendants, mirroring the terms of the TRO and extending through the pendency of the action. *Id.* ¶ 17.

On April 29, 2022, Plaintiff filed an application for a Clerk's Certificate of Default against Defendants in the action; and on the same day, the Clerk of the Court entered a Certificate of Default against Defendants.  *Id.* ¶¶ 19–20, Ex. D.  On May 2, 2022, Plaintiff moved for default judgment and a permanent injunction against Defendants.  Dkt. No. 26.

## DISCUSSION

### I.      Motion for Default Judgment

#### A.      Legal Standard

Federal Rule of Civil Procedure 55 sets forth a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default and the entry of a default judgment.  *See New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).

The first step, entry of a default, simply "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Mickalis Pawn Shop, LLC*, 645 F.3d at 128; *see also* Fed. R. Civ. P. 55(a).  The second step, entry of a default judgment, "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted" by the pleadings.  *Mickalis Pawn Shop*, 645 F.3d at 128; *see also* Fed. R. Civ. P. 55(b).  Whether entry of default judgment at the second step is appropriate depends upon whether the well-pleaded allegations against the defaulting party establish liability as a matter of law.  *See Mickalis Pawn Shop*, 645 F.3d at 137.

While a defendant who defaults admits the well-pleaded factual allegations in a complaint, because a party in default does not admit conclusions of law, "a district court need not agree that the alleged facts constitute a valid cause of action."  *Id.* (internal quotation marks and citation omitted); *see also Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 367 (S.D.N.Y. 2020) ("The essence of Fed. R. Civ. P. 55 is that a plaintiff can obtain from a default judgment relief

equivalent to but not greater than it would obtain in a contested proceeding assuming it prevailed on all of its factual allegations."). Therefore, this Court is "required to determine whether the [plaintiff's] allegations establish the [defendant's] liability as a matter of law." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). A party later challenging the entry of a default judgment must satisfy the "good cause shown" standard in Federal Rule of Civil Procedure 55(c), which "requires a court to weigh (1) the willfulness of default, (2) the existence of any meritorious defenses, and (3) prejudice to the non-defaulting party." *Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, 454–55 (2d Cir. 2013).

The legal sufficiency of a non-defaulting party's claims "is analyzed under the familiar plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), aided by the additional step of drawing inferences in the movant's favor." *WowWee Grp. Ltd. v. Meirly*, 2019 WL 1375470, at *5 (S.D.N.Y. Mar. 27, 2019). A default judgment entered on well-pleaded allegations does not reach the issue of damages, and a plaintiff "must therefore substantiate [his] claim for damages with evidence to prove the extent of those damages." *Hood v. Ascent Med. Corp.*, 2016 WL 1366920, at *15 (S.D.N.Y. Mar. 3, 2016), *report and recommendation adopted*, 2016 WL 3453656 (S.D.N.Y. June 20, 2016), *aff'd* 691 F. App'x 8 (2d Cir. 2017) (summary order).

To determine the amount of damages that should be awarded on a default judgment, Federal Rule of Civil Procedure 55(b)(2) "leaves the decision of whether a hearing is necessary to the discretion of the district court." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012). And "[w]here, on a damages inquest, the plaintiff makes a damages submission and the defaulting defendant makes no submission in opposition and does not request

a hearing, the court may determine the adequacy of the plaintiff's damages claim based on its submitted proofs." *Id.*

### B.    Liability

Plaintiff seeks default on its first and second causes of action, trademark counterfeiting and infringement in violation of the Lanham Act.  Futterman Aff. ¶ 8 n.2.  The Lanham Act holds liable any person who, without the consent of the registrant of a mark, uses in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark—or reproduces, counterfeits, copies, or colorable imitates a registered mark and applies such to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used—in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. 15 U.S.C. §§ 1114(1)(a)–(b).

To prevail on trademark counterfeiting and infringement claims, a plaintiff must establish that it has a valid mark entitled to protection and that the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.  *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).  To establish the former, a plaintiff may provide a certificate of registration with the U.S. Patent and Trademark Office for the mark as prima facie evidence of its validity.  *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).  Plaintiff may establish the latter—likelihood of confusion— through the eight factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961): the strength of plaintiff's mark, the degree of similarity between the two marks, the proximity of the parties' areas of commerce, the likelihood that plaintiff will bridge the gap separating their areas of activity, actual consumer confusion, whether defendant acted in bad faith or was otherwise reprehensible in adopting the mark, the quality of defendant's

product, and the sophistication of the relevant consumer group.  *See also Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016).  However, where counterfeit items are involved, the court "need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion."  *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003); *see also WowWee Grp.*, 2019 WL 1375470, at *7.

Plaintiff has established both elements as to each Defendant.  First, Plaintiff alleges it is the owner of the Squishmallows Marks that are currently in use in commerce in connection with Squishmallows Products, and it has attached a copy of the registration certificates for the Squishmallows Marks as Exhibit B to the Complaint.  *See* Compl. ¶¶ 15-16, Ex. B.  Second, Plaintiff have established that the marks on the Counterfeit Products are likely to cause confusion because they are demonstrably counterfeit.

The Lanham Act defines "counterfeit" as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.  Defendants have used, featured, or incorporated Squishmallows Marks in Defendants' listing titles.  *See* Compl. ¶¶ 39–41.  Further, Defendants' Counterfeit Products listed on Defendants' websites are nearly indistinguishable from Plaintiff's Squishmallows Products, with only minor variations that no ordinary consumer would recognize.  *Id.* ¶ 36.  Accordingly, the Counterfeit Products, by their nature, are likely to cause confusion.  The Court finds that default judgment on Plaintiff's trademark counterfeiting and infringement claims is warranted with respect to Defendants.

Although Plaintiff seeks statutory damages solely under the Lanham Act, their proposed permanent injunction references the Squishmallows Works and seeks to prohibit Defendants from future violations of the Copyright Act.  It is thus necessary to analyze the liability of

Defendants under the Copyright Act before imposing a permanent injunction upon them that would restrict them from violating the Copyright Act.

To prevail on a copyright infringement claim, a plaintiff must demonstrate: "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright.  *Id.*; *see also* 17 U.S.C. § 410(c).  Plaintiff has submitted such registration certificates for the Squishmallows Works and thus has met this first element.  *See* Compl., Ex. C.

To satisfy the second element, a plaintiff must demonstrate that: "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work]." *Yurman Design, Inc. v. PAJ Inc.*, 262 F.3d 101, 110 (2d Cir. 2001).  A plaintiff may demonstrate actual copying "either by direct or indirect evidence," but because "direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially," *Jorgensen*, 351 F.3d at 51, such as with "proof that the defendants had access to the copyrighted work and similarities that are probative of copying between the works," *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999).

"Access may be established directly or inferred from the fact that a work was widely disseminated or that a party had a reasonable possibility of viewing the prior work." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 270 (2d Cir. 2001).  Here, access can be inferred from the fact that Plaintiff sells the Squishmallows Products throughout the United States and the world through their website and third-party stores, and that the Squishmallows Products have achieved

9

popularity, including by receiving an award.  Compl. ¶¶ 11–12; *see also McGraw-Hill Glob. Educ. Holdings, LLC v. Khan*, 323 F. Supp. 3d 488, 498 (S.D.N.Y. 2018) ("Access may be inferred when the defendant has had a 'reasonable opportunity to view' plaintiff's work before creating his own." (quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1067 (2d Cir. 1988))).

Plaintiff has also alleged substantial similarity.  The test for substantial similarity between two items is whether an "ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."  *Hamil*, 193 F.3d at 100 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.)).  A side-by-side comparison of Plaintiff's Squishmallows Products and the Counterfeit Products offered for sale by Defendants demonstrates that they are virtually indistinguishable, if not completely identical.  *Compare* Compl., Ex. A (Squishmallows Products), *with* Compl., Ex. D (Counterfeit Products offered by each Defendant).  In comparing the works, the Court "could only reach one inescapable conclusion: the images are substantially similar because they are exact copies."  *Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 502 (S.D.N.Y. 2018) (quoting *Jackson v. Odenat*, 9 F. Supp. 3d 342, 352 (S.D.N.Y. 2014)).  "For the same reasons that the allegations in [the] Complaint establish that the products at issue are counterfeits, Plaintiff has carried its burden of showing actual copying and substantial similarity" and established liability on their copyright infringement claim so as to warrant a default judgment.  *William Mark Corp. v. 1 & CC,*, 2019 WL 4195365, at *7 (S.D.N.Y. May 20, 2019), *report and recommendation adopted*, 2019 WL 4194536 (S.D.N.Y. Sept. 3, 2019).

### C.    Statutory Damages

Plaintiff seeks statutory damages against the Defendants on their claims for trademark counterfeiting and infringement.  *See* Futterman Aff. ¶ 8 n.2.  Plaintiff asks for individual

statutory damages award against each of the eighty Defendants in the amount of $50,000 for a total of $4,000,000, plus post-judgment interest calculated pursuant to the statutory rate.  Dkt. No. 29 at 2; 15 U.S.C. § 1117(c).

Although a default judgment entered on well-pleaded allegations establishes a defendant's liability, it does not reach the issue of damages, and Plaintiff "must therefore substantiate its claim for damages with evidence to prove the extent of those damages."  *Hood v. Ascent Med. Corp.*, 2016 WL 1366920, at *15 (S.D.N.Y. Mar. 3, 2016), *report and recommendation adopted*, 2016 WL 3453656 (S.D.N.Y. June 20, 2016), *aff'd*, 691 F. App'x 8 (2d Cir. 2017).  The Lanham Act provides for statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just"; or if the court finds that the use of the counterfeit mark was willful, "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."  15 U.S.C. § 1117(a)–(c).

Congress enacted the statutory damages remedy in trademark counterfeiting cases because evidence of a counterfeiter's profits is almost impossible to ascertain since "records are frequently nonexistent, inadequate, or deceptively kept."  *Gucci*, 315 F Supp. 2d at 520; *see also Coach, Inc. v. Weng*, 2014 WL 2604032, at *16 (S.D.N.Y. June 9, 2014) ("Section 1117(c) of the Lanham Act was created to give victims of trademark infringement and unfair competition an avenue for recovering damages when a defendant hides, alters, or destroys business records.").  In determining appropriate statutory damages awards, courts typically consider the following factors: "(1) the expenses saved and the profits reaped by defendant; (2) the revenues lost by plaintiff; (3) the value of the mark; (4) the scale of defendant's infringement; (5) whether defendant's conduct was innocent or willful; (6) whether defendant has cooperated in providing

particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant and others." *Streamlight, Inc. v. Gindi*, 2019 WL 6733022, at *11–12 (E.D.N.Y. Oct. 1, 2019), *report and recommendation adopted*, 2019 WL 6726152 (E.D.N.Y. Dec. 11, 2019) (citing *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986)); *see also Gucci*, 315 F. Supp. 2d at 520.

The analysis of the first and second factors is identical for Defendants. The full extent of the profits reaped by Defendants and the revenues lost by Plaintiff as a result of the infringing activity of each defendant is unknown because of the failure of each defendant to appear. The effect of the default is that Defendants have not responded to the evidence of counterfeit sales with evidence of their own, such as expenses incurred that might reduce the damages award. *See Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 168–69 (S.D.N.Y. 1999); *see also Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985). The purpose of statutory damages is to relieve the plaintiff whose marks are counterfeited from the burdensome requirement of proving its precise damages or a precise figure for lost profits. *See Spin Master*, 463 F. Supp. 3d at 372. The trademark counterfeiter, particularly the counterfeiter who does not appear, is not entitled to a reduction on the assumption it sold the less expensive goods or an adjustment for expenses it has not proven. *Id.* In such cases, "it is appropriate for a court to rely on the revenue lost by Plaintiffs, rather than the profits earned by Defendant and further, to base that calculation on the assumption that Defendant sold the highest-grossing of the Plaintiffs' products." *Id.* However, in the present case, Plaintiff does not plead any information regarding its lost revenues or Defendant's sales volume from Defendant's counterfeiting activity. As a result, this Court focuses on the rest of the factors because Plaintiff should not be deprived of its right to recover statutory damages simply because it is impossible to discern the expenses

saved and profits reaped by Defendants.  *See Off-White LLC v. ^_^Warm House^_^Store*, 2019 WL 418501, at *5 (S.D.N.Y. Jan. 17, 2019).

The third factor is the value of the trademark.  Courts can "infer from the well-known reputations of most or all of the trademarks and the sea of advertising that presses them on the consciousness of the buying public that they are indeed valuable." *Polo Ralph Lauren v. 3M Trading Co.*, 1999 WL 33740332, at *6 (S.D.N.Y. Apr. 19, 1999).  The Squishmallows Products typically retail for between $7.99 to $44.99, Compl. ¶ 13, with an average price of $26.49. Plaintiff alleges that the Squishmallows Products have achieved great success since their debut in 2017, winning the best toy award in 2020. *Id.* ¶¶ 10–11.  On a motion for a default judgment, this Court is required to accept these factual allegations as true. *Finkel*, 577 F.3d at 84.  The Court thus finds the marks and copyrights to be highly valuable. *See, e.g.*, *Ideavillage Products Corp. v. Aarhus*, 2019 WL 2290514, at *7 (S.D.N.Y. May 7, 2019), *report and recommendation adopted*, 2019 WL 2287726 (S.D.N.Y. May 28, 2019); *Streamlight*, 2019 WL 6733022, at *13.

The fourth factor is the scale of Defendants' infringement, though some courts in this District have likened this factor to deterrence of parties other than the Defendants. *See, e.g.*, *Gucci*, 315 F. Supp. 2d at 520; *Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, 2016 WL 658310, at *5 (S.D.N.Y. Feb. 17, 2016) ("The need to deter other counterfeiters is particularly compelling given the apparent extent of counterfeit activity.").  Online marketplaces like DHgate provide a "virtually limitless number of customers" for the Counterfeit Products. *Streamlight*, 2019 WL 6733022, at *13 (defendants' use of Amazon.com online platform supported finding of widescale infringement); *see Rolex Watch, U.S.A., Inc. v. Pharel*, 2011 WL 1131401, at *5 (E.D.N.Y. Mar. 11, 2011) (defendants' use of three websites, including after receipt of two cease-and-desist letters, counseled in favor of fourth factor).  Application of this

factor to Defendants presents the Court with challenges because Plaintiff does not provide information regarding the number of sales of any of Defendants.  Thus, this factor remains neutral to both parties.

The fifth factor is willfulness.  "An infringement is willful where the defendant had knowledge or recklessly disregarded the possibility that its actions constituted infringement." *Streamlight*, 2019 WL 6733022, at *13.  "[C]ourts in [this Circuit] have concluded that use of marks that are 'virtually identical' to the registered marks renders 'inescapable' the conclusion that the defendant's infringement and counterfeiting was intentional."  *WowWee Grp.*, 2019 WL 1375470, at *10.  As discussed above, the Counterfeit Products are virtually identical to the Squishmallows Marks.  This factor weighs heavily in Plaintiff's favor with respect to each of Defendants.  In order to serve the interests of specific and general deterrence, the award should be multiples of what it would be had the infringement not been willful.

The sixth factor measures the degree of cooperation by the defendants.  This factor has been described in different ways in the case law.  Some courts look to whether the defendant has engaged in an "[a]ctive effort to mislead the court about continued willful counterfeiting," which "is a traditional aggravating factor in statutory damages."  *Sara Lee*, 36 F. Supp. 2d at 168. Other courts, however, have "construe[d] this element against defendants who fail to answer or appear, thus preventing the exchange of comprehensive discovery."  *Streamlight*, 2019 WL 6733022, at *14.  The Court concludes that it is more appropriate to look to whether the defendant has engaged in an effort to conceal the fact or scale of its wrongdoing or to mislead the plaintiff or the court about the existence or scale of counterfeiting.  *See Spin Master*, 463 F. Supp. 3d at 374.  If a defendant has the right to default, with the only consequence being that it has lost the ability to defend itself against the well-pleaded allegations of a complaint, it should

follow that the mere fact of a default should not increase the quantum of statutory damages.  *Id.* Cooperation might reduce the statutory damages award a court might otherwise be prepared to award but it cannot increase that award.  In this case, cooperation is neutral.  Plaintiff here has not argued that Defendants took active steps to conceal their identities or to avoid detection nor have they presented evidence (including in the form of an expert affidavit) that would support that conclusion.  On the other hand, Defendants have not done anything to suggest cooperation.

The seventh and final factor is the potential for deterring the Defendants.  This factor is intended to "send a signal to these defendants" and impose a punitive component; at the same time, "the need for high statutory damages as a specific deterrent is less pressing" when the Court is simultaneously granting a permanent injunction.  *Streamlight*, 2019 WL 6733022, at *14; *see also WowWee Grp.*, 2019 WL 1375470, at *10.

When a plaintiff's standard character mark is subject to numerous trademark registrations, and a defendant counterfeits or infringes on those trademark registrations, the Court may find that the defendant committed multiple trademark violations for the purposes of calculating statutory damages.  *See Yahoo! Inc. v. XYZ Companies*, 872 F. Supp. 2d 300, 307 (S.D.N.Y. 2011) (finding that since the Yahoo! standard character mark was the subject of five trademark registrations, the defendants counterfeited five registered marks when calculating statutory damages).  Here, Plaintiff alleged that each defendant infringed only one of Plaintiff's Squishmallows Marks for the sale of one class of good, the plush toys only.  Dkt. No. 35 at 3. Thus, the calculation of statutory damages should be based on the fact that Defendants each committed one trademark violation.

The Court concludes that it is appropriate to award an amount of statutory damages against each of Defendants calculated in reference to the damages that would be available against

15

each upon a finding of willful infringement under Section 1117(c)(2) of the Lanham Act.  The damages are thus calculated as $50,000 per mark for a total of $4,000,000.

## II.     Motion for a Permanent Injunction

When a plaintiff has succeeded on the merits, as Plaintiff has here on the default judgment, the Court may enter a permanent injunction to prevent further violations of trademark infringement and counterfeiting if plaintiff has demonstrated: "(1) that it suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships between the parties warrants a remedy in equity for the plaintiff; and (4) that the public interest would not be disserved."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see* 15 U.S.C. § 1116.  This standard applies in both copyright and trademark infringement actions.  *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) (trademark); *Salinger v. Colting*, 607 F.3d 68, 77–78 (2d Cir. 2010) (copyright).

Plaintiff has met all four factors for the Defendants.  First, "[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither calculable nor precisely compensable."  *Int'l Council of Shopping Ctrs., Inc. v. Glob. Infotech LLC*, 2019 WL 2004096, at *5 (S.D.N.Y. May 7, 2019) (internal quotation marks omitted) (quoting *U.S. Polo Ass'n*, 800 F. Supp. 2d at 540).  Plaintiff has not only suffered lost profits, but it also argues that it has suffered irreparable harm to the goodwill and reputation associated with the Squishmallows Products given the likelihood of confusion between the Squishmallows Products and Counterfeit Products.  *See* Compl. ¶ 56; *see also Int'l Council of Shopping Ctrs*, 2019 WL 2004096, at *5.  Second, a "plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue" its infringement.  *Pearson Educ., Inc. v. Vergara*, 2010 WL

16

3744033, at *4 (S.D.N.Y. Sept. 27, 2010) (citation omitted). "Where the defendant defaults, a court may infer that the defendant is willing to, or may continue its infringement." *Id.* at *12; *see also Mister Softee, Inc. v. Diaz*, 2020 WL 5665240, at *8 (E.D.N.Y. July 2, 2020) (cleaned up); *see also William Mark Corp. v. 1 & CC*, 2019 WL 4195365, at *11 (S.D.N.Y. May 20, 2019) ("The Defaulting Defendants' past infringing behavior and potential for further activity across multiple marketplace platforms amply suggest that the Defaulting Defendants might continue to engage in infringing activities and counterfeiting unless enjoined by the Court, demonstrating the danger that monetary damages will fail to fully provide Plaintiffs with relief." (internal quotation marks and citations omitted) (quoting *WowWee Grp. v.* , 2019 WL 1316106, at *5)). Such an inference is warranted here where the evidence shows that the Defendants engaged in counterfeiting activity. There is also a strong probability that, absent an injunction, Defendants will continue to infringe, as they have already sold Counterfeit Products and/or infringed the Squishmallows Marks, and have more infringing products available for sale in their Merchant Storefronts. *See Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 519 F. Supp. 730, 732 (S.D.N.Y. 1981). Monetary damages are also inadequate to compensate Plaintiff for the reputational harm they have suffered and may continue to suffer. *See Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008) ("In view of the irreparable harm that would flow from Defendant's continuing infringement, including lost sales of Rowling's companion books and the injury to Rowling as a writer, Plaintiffs have shown that money damages alone are an insufficient remedy.").

Third, the balance of hardships favors Plaintiff because, through their default, Defendants have not identified any hardships for the Court to consider—nor could they. "It is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." *WPIX,*

*Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) (citation omitted) (in context of preliminary injunction).  Finally, a permanent injunction would serve the public interest because "the public has an interest . . . in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."  *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

However, while Plaintiff has demonstrated that a permanent injunction is warranted in this case, the language of the permanent injunction is too broad in several respects.

### A.    Persons Enjoined

Paragraph III(3) of the proposed permanent injunction would have had the Court enjoin the following persons: the "Defendants, their respective officers, agents, servants, employees, successors and assigns and all persons acting in concert with or under the direction of Defendants (regardless of whether located in the United States or abroad) who receive actual notice of this Order."  Dkt. No. 29 ¶ III(3).

Fed. R. Civ. P. 65(d)(2) authorizes the Court to enjoin "only" the following who receive actual notice of the injunction: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."  It may be that a successor or an assign will be in active concert with one of the persons described in the Rule, but the Court's order should track the language prescribe by the rulemakers.  The Court will replace the proposed language with the language of Rule 65(d)(2) by eliminating "successors and assigns" and replacing "acting in concert" with "acting in active concert."  *See Spin Master*, 463 F. Supp. 3d at 377.

### B.    Document Retention

Paragraph III(3)(E) asks the Court to enjoin the Defendants from:

[S]ecreting, concealing, destroying, altering, selling off, transferring or otherwise disposing of (i) Counterfeit Products and/or (ii) any computer files, data, business records, documents or any other records or evidence relating to:

i. Defendants' User Accounts and/or Merchant Storefronts;

ii. Defendants' Assets; and

iii. the manufacture, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products by Defendants and by their respective officers, employees, agents, servants and all persons in active concert or participation with any of them.

Dkt. No. 29 ¶ III(3)(E).

User Accounts are defined extraordinarily broadly to include websites and accounts that are not used and never have been used for the sale of Counterfeit Products. "User Accounts" are defined as "[a]ny and all websites and any and all accounts with online marketplace platforms such as DHgate, as well as any and all as yet *undiscovered accounts* with additional online marketplace platforms held by or associated with Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them." Dkt. No. 29 at ii (emphasis added). "Defendants' Assets" are also defined broadly as "[a]ny and all money, securities or other property or assets of Defendants (whether said assets are located in the U.S. or abroad)." *Id.* at iii.

In other words, this section would have the Court enter a broad permanent injunction requiring Defendants to retain all kinds of documents relating to their businesses regardless of any connection to the sale of Counterfeit Products.

The Court granted a similar injunction against document spoliation at the TRO and preliminary injunction stage. *See* Dkt. Nos. 18, 20. That was appropriate. When a party "destr[oys] or significant[ly] alter[s] evidence, or . . . fail[s] to preserve property for another's use as evidence in pending or reasonably foreseeable litigation," that is wrongful and constitutes

spoliation.  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  At the TRO

and preliminary injunction stage, it was not clear which User Accounts were used to sell

Counterfeit Products as Plaintiff had not yet had the opportunity to take discovery.  Thus, where

there is a risk that a party will destroy or alter evidence, courts have not hesitated to grant such

relief, which protects the litigants and preserves the integrity of the action before it.  *See U.S.

Commodity Futures Trading Com'n v. Falco & Stevens, Inc.*, 2006 WL 1134171, at *3

(S.D.N.Y. Mar. 6, 2006); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)

(obligation to preserve evidence arises when a party has "notice that the evidence is relevant to

litigation").

     At this stage, however, as a result of the default judgment, there will be no pending or

reasonably foreseeable litigation against Defendants as to whom the Court has personal

jurisdiction.  The case will be closed.  The judgment will constitute res judicata.  And, if and

when litigation does become reasonably foreseeable, Defendants may have an obligation to

preserve evidence that is relevant to the litigation regardless of this Court's order.  *See Fujitsu

Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).  There is no need—or warrant—to

order Defendants to preserve documents that "may" be relevant to a litigation or that is relevant

but to litigation that has ended and presumably will not recur.  *Spin Master*, 463 F. Supp. 3d at

378.  Thus, it is not appropriate for the Court to broadly enjoin Defendants to preserve all

documents related to their User Accounts or their Assets, which may or may not be used in

connection with infringing or other Counterfeit Products and whose activities are not illegal in

and of themselves.  *See id*.

     Depending on the jurisdiction and on the law that governs the defendants, a defendant

may have an obligation to preserve records regarding its assets or business activities.  *See, e.g.*,

15 U.S.C. § 78q(a) (requiring registered broker-dealers to make and keep records prescribed by the U.S. Securities and Exchange Commission).  But, if the law does not require a document to be preserved, a person generally does not have the obligation to retain it.  The proposed language thus would restrict defendants from engaging in lawful activity and would reach far beyond the specific legal violations alleged in the Complaint.  *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999) (an injunction should be "narrowly tailored to fit specific legal violations' because the district court 'should not impose unnecessary burdens on lawful activity" (internal quotation marks omitted) (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994))).

The request in clause (iii), however, is different.  That clause provides for the preservation of documents relating to "the manufacture, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products by Defendants and by its respective officers, employees, agents, servants and all persons in active concert or participation with any of them."  The Court has the power to impose recordkeeping requirements ancillary to an injunction and to make injunctive relief effective. *See Gucci*, 315 F. Supp. 2d at 523 (requiring infringer to purchase only through authorized dealers and "to maintain adequate records in that regard").  And, since this request is limited to records regarding illegal activity, an injunction will not restrain otherwise lawful activity.

### C.   Permanent Injunction Against Financial Institutions and Third-Party Service Providers

Paragraphs III(5)–(6) asks for broad injunctive relief against "Financial Institutions" and "Third Party Service Providers."  Financial Institutions are defined as:

> Any and all banks, financial institutions, credit card companies and payment processing agencies, such as DHgate (*e.g.*, DHpay.com), PayPal Inc. ("PayPal"), Payoneer Inc. ("Payoneer") and PingPong Global Solutions, Inc. ("PingPong") and

other companies or agencies that engage in the processing or transfer of money
and/or real or personal property of Defendants.

Dkt. No. 29 at iii.  Third Party Service Providers are defined as:

> Online platforms, including, without limitation, those owned and operated, directly
> or indirectly, by DHgate, as well as any and all as yet undiscovered online
> marketplace platforms and/or entities through which Defendants, their respective
> officers, employees, agents, servants and all persons in active concert or
> participation with any of them manufacture, import, export, advertise, market,
> promote, distribute, offer for sale, sell and/or otherwise deal in Counterfeit Products
> which are hereinafter identified as a result of any order entered in this action, or
> otherwise.

*Id.* at iii–iv.

Paragraph III(5) enjoins Financial Institutions and Third Party Service Providers from,
among other things, (1) secreting, concealing, destroying, altering, selling off, transferring or
otherwise disposing of and/or dealing with any computer files, data, business records, documents
or other records or evidence relating to Defendants' Frozen Assets and Defendants' Financial
Accounts, (2) knowingly instructing, aiding or abetting any other person or business entity in
engaging in any of the activities enjoined by the proposed permanent injunction.  *Id.* ¶¶ III(5)(i)–
(ii).  The "Frozen Assets" are those that were frozen pursuant to the Court's TRO, which were
"[a]ny and all money, securities or other property or assets of Defendants (whether said assets
are located in the U.S. or abroad)."  Dkt. No. 29 at iii.  The "Financial Accounts" are defined as
"[a]ny and all financial accounts associated with or utilized by any Defendants or any
Defendants' User Accounts or Merchant Storefront(s) (whether said account is located in the
U.S. or abroad)."  Dkt. No. 29 at iii.

In short, Plaintiff would have the Court issue them a blank check to fill in with any online
marketplace they discover that sells or deals with Counterfeit Products or, even more broadly
and expansively, any financial institution that engages in the processing or transfer of money of a

Defendant, regardless of whether that money is tied to the Counterfeit Products. This section must be stricken.

The Court lacks authority to, and will not, enjoin third parties, including financial institutions and third-party service providers, who are not before the Court. *Spin Master*, 463 F. Supp. 3d at 380. "A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction." 11A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2956 (3d ed. 2020) (hereinafter, "Wright and Miller"). Indeed, "holding a nonparty in contempt for engaging in enjoined conduct might be considered as a possible denial of due process." *Id.*

Fed. R. Civ. P. 65(d)(2) carves out a limited and circumscribed exception to that general principle. On the notion that a party cannot do indirectly through a privy what it is circumscribed from doing directly and that jurisdiction resides over privies, *see Hansberry v. Lee*, 311 U.S. 32, 38 (1940), Rule 65 permits the court to enjoin, in addition to the parties, their officers, agents, servants, employees, attorneys, and others in "active concert and participation" who have notice of the injunction. *See* Wright and Miller § 2956 ("The limitations or exceptions on binding the various persons listed in Rule 65(d)(2) in their individual capacities is required by contemporary notions of due process; they are premised on the fact that a party's officers, agents, servants, employees, and attorneys have not had an opportunity to appear before the court in their individual capacities and present personal defenses to the granting of injunctive relief against them.").

"'[A]ctive concert or participation' exists if the third party 'aided and abetted' the party subject to the injunction," which requires showing "that the non-party had actual knowledge of the judicial decree and violated it, and that the challenged action was taken for the benefit of, or

to assist, a party subject to the decree." *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 36 (S.D.N.Y. 2015) (citation omitted).  Rule 65(d) is thus based on "the assumption that the named defendant is an adequate representative of the rights of those persons listed in the rule who are not in a derivative relationship with the defendant," Wright and Miller § 2956, and it "represents 'an exception to the general principle that a court cannot 'make a decree which will bind any one but a party,'" *Allstar Mktg. Grp. LLC v. 158*, 2019 WL 3936879, at *3 (S.D.N.Y. Aug. 20, 2019) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, J.)).  The Rule is designed for a limited purpose: "to codify the common-law doctrine that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although [those aider and abettors] were not parties to the original proceeding." *Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302–03 (2d Cir. 1999) (citation omitted).  It is for that reason that the Court will enjoin only persons in active concert or participation with the Defendants— whether they are financial institutions or third-party service providers or not—from infringing Plaintiff' Squishmallows Marks and Squishmallows Works.

In requesting the Court to enjoin every (or any) financial institution or third-party service provider, Plaintiff thus asks it to go where it is not permitted.  The proposed permanent injunction seeks to bind financial institutions and third-party service providers without any finding that they are in "active concert or participation" with Defendants.  A "bank[] or financial institution[] . . . that engage[s] in the processing or transfer of money and/or real or personal property" of a Defendant may or may not be an aider and abettor and thereby a privy of a Defendant.  Likewise, an "[o]nline marketplace platform[] . . . through which [a Defendant or one of its privies] manufacture[s] . . . and/or . . . deal[s] in Counterfeit Products" may or may not be an aider and abettor or in active concert or participation with a Defendant.  It will depend on

the facts. *See* Wright and Miller § 2956 ("[T]he best way to approach the question of 'privity' may be to analyze the facts of each case."). This Court cannot prejudge now—before knowing the facts—whether any particular financial institution or third-party service provider is necessarily and by definition an aider and abettor. *See Allstar Mktg. Grp*, 2019 WL 3936879, at *3 ("The Court cannot conclude that a third-party who merely holds the Defaulting Defendants' assets—which may be wholly unrelated to the counterfeiting at issue in this case—is by definition 'in active concert or participation' with the Defaulting Defendants."); *see also Nike, Inc. v. Wu*, 2020 WL 257475, at *19 (S.D.N.Y. Jan. 17, 2020) ("Courts in this district have repeatedly rejected the argument that a bank is 'in active concert and participation' when it provides routine banking activities to an enjoined party.").

Paragraphs III(5) and III(6) also go beyond the power of the Court in the activity Plaintiffs seek to enjoin. Paragraph III(5) would prohibit Financial Institutions and Third Party Service Providers from transferring or paying any of Defendants' Frozen Assets without further order of the Court. Dkt. No. 29 ¶¶ III(5)(i)–(ii). Paragraph III(6) would enjoin Third Party Service Providers from, in any way, (1) providing services to the User Accounts or Merchant Storefronts of the Defendants, and (2) knowingly instructing, aiding or abetting any other person or business entity in engaging in any of the activities enjoined by the proposed permanent injunction. Dkt. No. 29 ¶¶ III(6)(i)–(ii).

Regarding Paragraph III(5), now that Plaintiff has a judgment against the Defendants, state law governs enforcement of and execution on that judgment. There may be competing parties who have equal or superior rights to the assets in defendants' accounts. The Court will no longer supervise withdrawal from those accounts.

As to Paragraph III(6), it is, in effect, a shut-down order.  As drafted, it would prevent Third Party Service Providers from offering any and all services to User Accounts associated with the Defendants—even those that have not been associated with the Counterfeit Products— and to Merchant Storefronts that may have been used to advertise or sell Counterfeit Products in the past, regardless of how many legitimate goods these User Accounts or Merchant Storefronts sold or currently sell and regardless of whatever the particular defendant might want to sell in the future.  This prohibition violates the fundamental principle that "[i]njunctive relief should be narrowly tailored to fit specific legal violations" and that "an injunction should not impose unnecessary burdens on lawful activity."  *Waldman*, 43 F.3d at 785; *see also Mickalis Pawn Shop*, 645 F.3d at 145 ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation.").  Even though a "party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party," the injunction "must nonetheless be narrowly tailored to fit specific legal violations."  *Victorinox AG v. B & F Sys., Inc.*, 709 F. App'x 44, 51 (2d Cir. 2017) (internal quotation marks and citations omitted).

This Court would not have the authority to enjoin a merchant who operated a physical store from obtaining any financing or third-party services on a showing that such merchant had in the past infringed a trademark or copyright or sold counterfeit goods.  *See Gucci*, 315 F. Supp. 2d at 523 ("[O]nly in the most unusual circumstances could such a categorical ban on the sale of genuine goods be considered 'narrowly tailored' to the violation.").  There is no sufficient justification for doing so for merchants who operate by virtual storefronts.

### D.   Service of Asset Restraining Notice

Plaintiff seeks to serve asset restraining notices upon Defendants, Third Party Service Providers, and Financial Institutions after the Court enters its final judgment.  Dkt. No. 28 at 1.

Fed. R. Civ. P. 69(a)(1) states: "The procedure on execution—and in proceedings supplementary to and in aid of judgments or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  The applicable "procedure of the state where the court is located" is N.Y. C.P.L.R. § 5222, which permits a judgment creditor to serve a restraining notice on a person who holds property belonging to the judgment debtor in order to prevent that person from transferring the property. N.Y. C.P.L.R. § 5225 then authorizes the commencement of a special proceeding or motion practice against the person in possession of that property that may ultimately result in the transfer of the property after finding personal jurisdiction over the garnishee and a hearing.  Fed. R. Civ. P. 69 does not provide exceptions except as those are legislated by Congress.  *Cf. Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 834 (1988) ("Federal Rule of Civil Procedure 69(a) . . . defers to state law to provide methods for collecting judgments.").

Together, and importantly, these provisions require that notice and an opportunity to be heard be given to third parties in possession of, or who may be entitled to, those assets before transfer.  Thus, under N.Y. C.P.L.R. § 5222, were the Plaintiff seeks to execute on a bank account where a Defendant's assets were held, it would have to give notice to all persons who have competing, and perhaps superior, interests in those assets.

Plaintiff's proposed relief violates the plain language of the Federal Rules and undermines that careful balance.  It would give Plaintiff rights superior to those of other creditors that Congress did not intend them to have.  Under Plaintiff's proposed permanent injunction, a financial institution holding an asset of a defendant necessary to satisfy the judgment would have to transfer that asset to Plaintiff upon the mere request of Plaintiff.  They would have to do so even if another third party had a superior claim to that asset.  They would have to do so without

providing prior notice.  And they would have to do so on pain of contempt if they failed to comply.  *See Allstar Mktg. Grp.*, 2019 WL 3936879, at *4.

That result would run counter to the policy of N.Y. C.P.L.R. §§ 5222 and 5225, which protect the interest of third parties who may have superior rights to the assets, by effectively depriving third parties of their right to procedural relief.  In addition, Plaintiff's request, in effect, would have the Court grant them a blank check and permit them to freeze unknown assets in unknown accounts possessed by the Financial Institutions, which are broadly defined and yet to be determined.  But Sections 5222 and 5225 do not permit Plaintiff to "brandish the Court's authority over unknown third-parties, the identities of whom are unknown to the Court and over whom the Court may not possess personal jurisdiction."  *Allstar Mktg. Grp.*, 2019 WL 3936879, at *4; *see also WowWee Grp. Ltd. v. Meirly*, 2020 WL 70489, at *3 (S.D.N.Y. Jan. 7, 2020) (plaintiffs must identify the particular property as to which they seek a turnover).

Finally, Fed. R. Civ. P. 64 and 65 do not provide the Court with authority for the post-judgment asset restraint.  Rule 64 permits a court to seize a person or property to secure satisfaction of a potential judgment "under the law of the state where the court is located" unless a federal statute governs in this instance.  Rule 65 governs injunctions and restraining orders against only certain persons who may be bound: parties, officers, agents, servants, employees, attorneys, and other persons who are active concert or participation with these groups.  Fed. R. Civ. P. 65(d)(2).  This Rule also does not provide Plaintiff with the authority it seeks.  In order to effectuate a freeze and transfer of Defendants' assets, the Court would need to bind Financial Institutions holding those assets, and the Court has already declined to do so.  As a result, if Plaintiff wishes to enforce a monetary judgment,

they "must do so in accordance with the procedures set forth by New York law, specifically C.P.L.R. Article 52." *Allstar Mktg. Grp.*, 2019 WL 3936879, at *2.

### E.     Dissolution of Rule 62(a) Stay

Under the federal rules, "execution on a judgment and proceedings to enforce it are stayed for 30 days after its entry, unless the court orders otherwise." Fed. R. Civ. P. 62(a). Plaintiff requests that the automatic thirty-day stay be dissolved to prevent Defendants from potentially hiding their assets during that period. *See Allstar Mktg. Grp.*, 2019 WL 3936879 at *4 n.6 ("if a plaintiff is concerned that defendants might attempt to conceal assets during the pendency of the automatic stay, it should include a dissolution of that stay as part of the relief requested in its proposed judgment."). The Court finds such relief appropriate and hereby dissolves the automatic stay and allows for the immediate enforcement of the judgment.

## CONCLUSION

The motion for default judgment and a permanent injunction is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. No. 26 and to close the case.

SO ORDERED.

Dated: July 18, 2022
     New York, New York
                                      LEWIS J. LIMAN
                            United States District Judge